UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| CAH ACQUISITION COMPANY 11, LLC, ) | |
| dba LAUDERDALE COMMUNITY ) | Case No. 19-22020-DSK |
| HOSPITAL, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| _____ ) | |

**OBJECTION OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
TO DEBTOR'S MOTION FOR ENTRY FOR AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; (B) AUTHORIZING DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING DEBOTR'S REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE; (C) APPROVING BID AND SALE PROCEDURES; (D) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (E ) GRANTING RELATED RELIEF**

The United States Department of Health and Human Services ("DHHS"), by and through the United States Attorney, submits this objection to Debtor's motion to sell assets (ECF No. 220). DHHS does not object to a sale of Lauderdale Community Hospital ("Hospital"). However, DHHS has two significant related concerns. On behalf of its agency the Centers for Medicare & Medicaid Services ("CMS"), which operates the Medicare program, DHHS is concerned to ensure that the Hospital's

1

Medicare provider agreement with DHHS is treated in a manner fully consistent with the applicable law of Medicare. And on behalf of its agency the Health Resources and Services Administration ("HRSA"), which is presently overseeing distributions from the CARES Act Provider Relief Fund created in response to the coronavirus pandemic, DHHS is concerned to ensure that the applicable federal policies and directives are followed.

Each agency's objection is discussed in turn.

## I. Objection of the Centers for Medicare & Medicaid Services with regard to the Medicare provider agreement

DHHS operates the Medicare program, the federal health insurance program for the elderly and the disabled, through CMS. Debtor holds a Medicare provider agreement with DHHS. The administrative identifier associated with this Medicare provider agreement is 44-1314. There are substantial known Medicare overpayments that have been issued under this Medicare provider agreement. Moreover, there are several Medicare cost reports that have not yet been audited. The audits of these several cost reports could reveal either additional overpayments or they could reveal underpayments.

Debtor's motion to sell its assets (ECF No. 220) does not mention the Medicare provider agreement. Debtor has filed an Asset Purchase and Sale Agreement ("APA") (ECF No. 220-1), which does discuss Medicare-related matters. The APA indicates that certain the "Known Liabilities under . . . cost reports" will be paid in cash at the

2

time of sale closing. ECF No. 220-1 at § 2.1.1.(c). The APA also indicates that certain other Medicare-related liabilities will be paid "under the terms of a CMS Cure Agreement to be negotiated." ECF No. 220-1 at §§ 2.1.1.(c); 4.1.4. [1] The hoped-for negotiated arrangement is designated in the APA as a condition of closing. ECF No 220-1 at §13.1.3. The APA also does appear to anticipate that the purchaser of the Hospital will have liability for any cost report-related liabilities that are "unknown . . . at Closing." ECF No. 220-1 at §2.2.3. There is, however, no explicit discussion of any proposed treatment of the Hospital's Medicare provider agreement itself. For the avoidance of any doubt, DHHS submits this limited objection on behalf of CMS in order to state the applicable law of the Medicare provider agreement, in advance of any auction and of the sale hearing. *See* ECF No. 228 at p.6. [2]

In support of this portion of its objection, DHHS states as follows:

1.     Medicare is a program of the Social Security Act, at Title XVIII, created in 1965 and codified at 42 U.S.C. §§ 1395 *et seq*. Medicare is an enormous national health insurance program that processes over a billion claims for payment each year.

---

[1]  To date, there have been no negotiations on this score.

[2]  To the extent Debtor may seek to transfer the Hospital's *Medicaid* Provider Agreement, Debtor must serve the State of Tennessee. Although the Federal Government does supply a substantial share of the funding for Medicaid, it is each State Government that actually administers the Medicaid program in its state. *See Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (describing Federal and State roles in Medicaid).

3

It is a "phenomenally regulated system." *In the Matter of Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 119 (Bankr. M.D. Fla. 1990); *see Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) (describing Medicare as "a massive, complex health . . . program . . . embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations . . .").

2.  A hospital may seek to participate in the Medicare program, in order to receive Medicare payments as business revenues, for services that the hospital renders to the elderly and disabled persons whom Medicare insures. These elderly and disabled persons are the intended beneficiaries of the program. *See Baylor Univ. Med. Clinic v. Heckler*, 758 F.2d 1052, 1059 (5th Cir. 1985). The courts have long recognized that healthcare businesses are merely incidental beneficiaries of government healthcare payment programs such as Medicare or Medicaid. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, -- U.S. --, 135 S.Ct. 1378, 1387 (2015); *Dialysis Ctrs., Ltd. v. Schweiker*, 657 F.2d 135, 138 (7th Cir. 1981).

3.  A Medicare provider agreement is a unique agreement entered into between a healthcare business and the Secretary of DHHS. 42 U.S.C. § 1395cc. Unless a business holds a valid Medicare provider agreement with DHHS, the business cannot seek Medicare payments for services rendered to Medicare beneficiaries. 42 U.S.C. § 1395f(a). The Medicare provider agreement comprehensively incorporates among its governing terms the entire set of applicable Medicare statutory and regulatory provisions. *See*, *e.g.*, *In re Neumann*, 55 B.R. 702,

4

705 (S.D.N.Y. 1985); *In re Monsour Med. Ctr.*, 11 B.R. 1014, 1018 (W.D. Penn. 1981); *In re St. John's Home Health Agency, Inc.*, 173 B.R. 238, 247 (Bankr. S.D. Fla. 1994).

4. The Medicare provider agreement is the basis of the legal relationship between DHHS and the business. In choosing to enter into a provider agreement with DHHS, the health care business subscribes itself fully to the applicable law of Medicare. The business agrees to maintain compliance with Medicare's health and safety requirements for a provider of the applicable type (*e.g.*, hospital, nursing home, hospice, *etc.*) and to adhere to the myriad terms, conditions, and criteria that govern proper Medicare billing. DHHS, in turn, agrees to pay the business for certain healthcare services delivered to the Medicare program's beneficiaries, with payments made in accordance with the terms of Medicare law. *See Cmty. Health Servs. of Crawford Cty.*, 467 U.S. at 54-55 (1984) ("Under the contract, the [provider] receive[s] reimbursement from [Medicare] . . .").[3]

5. The Medicare payments that are issued to a business pursuant to a Medicare provider agreement are well-recognized as a single, ongoing transaction of

---

[3] Accordingly, a Medicare provider agreement serves a purpose not unlike a provider agreement between any health insurer and a healthcare business. *See generally Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 214 (1979) (describing insurer's provider agreements as arrangements "for the purchase of goods and services" by the insurer from healthcare businesses); *Int'l Healthcare Mgt. v. Haw. Coal. for Health*, 332 F.3d 600, 602 n.2 (9th Cir. 2003) ("A participating provider agreement is a [healthcare business'] contract with a health plan. It establishes the [healthcare business'] rights and responsibilities in providing medical services to insured patients.").

up-front, estimated amounts that remain subject to later accounting and adjustment. *E.g.*, *U.S. v. Consumer Health Servs. of America*, 108 F.3d 390, 394-96 (D.C. Cir. 1997). The payment provision of the Medicare statute, at 42 U.S.C. § 1395g(a), calls for "necessary adjustments on account of previously made overpayments and underpayments" when determining the amount of payment presently due. Section 1395g(a) defines the Medicare program's substantive payment liability to a provider. *Consumer Health Servs.*, 108 F.3d at 394-95. "There is no evading [section 1395g(a)] or circumventing it under any authority or at any time." *In re Tri County Home Health Servs. Inc.*, 230 B.R. 106, 112 (Bankr. W.D. Tenn. 1999).

6. Typically, the determination that an overpayment or underpayment has occurred may be made when the provider's annual Medicare cost report is audited by DHHS (through its Medicare contractors). It is "inherent" in the nature of the Medicare payment system that these retrospective reviews and audits can reveal that an overpayment or an underpayment occurred. *See Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*, 224 F.3d 1008, 1014 (9th Cir. 2000).

7. The possibility of overpayments or underpayments may be particularly high in the instance of an operation such as Debtor's. Debtor's operation is a small rural hospital certified as a provider type called a critical access hospital by Medicare law. Although most provider types are now paid by Medicare on the basis of prospectively-determined rates, this particular provider type is paid on the basis of the individual hospital's 'reasonable costs.' 42 U.S.C. § 1395f(l)(1); 42 C.F.R. §§

413.70(a)(1), 413.70(b)(2)(i). Therefore, the audits of cost reports are critical elements of the payment system.

8. By the terms of Medicare law, overpayments must be accounted for in the course of calculating the amount of Medicare payment presently due. *See* 42 U.S.C. § 1395g(a). The process by which a Medicare overpayment gets accounted for is well-recognized as recoupment: the amount of the previous overpayment is withheld from the provider's current payments. The "overwhelming majority of district and bankruptcy courts nationwide which have ruled" on the matter have recognized this adjustment process as recoupment. *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004); *see, e.g., Sims*, 224 F.3d 1008; *Consumer Health Servs.*, 108 F.3d 390; *Tri County Home Health Servs. Inc.*, 230 B.R. 106.[4]

9. Until such time as a Medicare provider agreement is terminated, there

---

[4] Medicare law contains its own comprehensive and exclusive remedial scheme for adjudicating any challenge that a provider may have to a determination made by the Medicare program. For instance, there are specified processes by which a provider may challenge a Medicare cost report determination, 42 U.S.C. § 1395oo; or may challenge a payment determination on an individual Medicare claim, 42 U.S.C. § 1395ff; *etc*. Any challenge to a decision made by the Medicare program must be made through the applicable administrative appeal process. *See S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 678 (6th Cir. 2013). Suits sounding in tort, contract, or other theories are not permitted. *See* S. Rep. No. 404, 89th Cong., 1st Sess. 1965, 1965 USCCAN 1943, 1995 (June 30, 1965) (legislative history to Medicare statute, stating "It is intended that the remedies provided by these review procedures shall be exclusive."). In a vast national program of the size and scope of Medicare, with thousands of providers seeking Medicare revenues, and with over a billion claims for Medicare payment filed each year, Congress reasonably chose to standardize the rights, the recourse, and the remedies that are available.)

are outstanding obligations for both DHHS and the provider to perform. At any given time, the provider is in the midst of a fiscal reporting period. After the close of the fiscal period, the provider is required to file a Medicare cost report for that fiscal period. DHHS, for its part, must audit that Medicare cost report thereafter.

10. A Medicare provider agreement with DHHS is not something that can be sold. *See* 42 C.F.R. § 424.550 (prohibition against selling or loaning Medicare privileges). Under Medicare law, the one circumstance in which *a Medicare provider agreement may be assigned* is in the context of a change of ownership of a provider as a going concern. In this circumstance, a Medicare provider agreement may be assigned to a third party, subject to approval by DHHS.

11. The applicable regulation is found at 42 C.F.R. § 489.18. An assignee must take assignment of the Medicare provider agreement "subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued." 42 C.F.R. § 489.18(d). With the assignment of a Medicare provider agreement, the new owner of the provider (as assignee of the provider agreement) "merely steps into the shoes of the prior owner." *Eagle Healthcare, Inc. v. Sebelius*, 969 F.Supp.2d 38, 40 (D.D.C. 2013) (citations omitted).[5] The regulation at 42 C.F.R.

---

[5] "Provider [of services]" is a Medicare statutory term, 42 U.S.C. 1395x(u), referring to the Medicare-certified healthcare operation itself. This statutory term does not refer to the business corporation that may own the hospital now nor to the business corporation(s) that may have owned the hospital previously or may own it in the future. Although the corporate ownership may change, the "provider" itself remains the same. *Eagle Healthcare*, 969 F.Supp.2d 38 at 40; *see Delta Health Grp, Inc. v.*

§ 489.18 entails a full "continuity of obligations." *Mission Hosp. Reg'l Med. Ctr. v. Burwell*, 19 F.3d 1112, 1116 (9th Cir. 2016). This continuity of obligations is an "essential" element of the Medicare payment system. *Id.*

12. Accordingly, the Medicare provider agreement is assigned with all of its rights to payment, privileges, responsibilities, fiscal liabilities, and obligations intact, all flowing to the assignee. In other words, the provider agreement is assigned *in toto*. Applicable Medicare law "unambiguously" requires the assignee of the provider agreement to take liability for Medicare overpayments that were made to the assignor. *U.S. v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994); *see also Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100 (8th Cir. 2000) (holding that assignee of Medicare provider agreement is liable for monetary penalty that CMS had imposed under that provider agreement prior to the assignment); *Triad at Jeffersonville I v. Leavitt*, 563 F.Supp.2d 1, 6 (D.D.C. 2008) (also discussing terms applicable to assignment of a Medicare provider agreement).

13. The upshot, then: "If the new owner [of a provider] elects to take assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments" and all other associated liabilities. *Official Comm. of Unsecured*

---

*U.S. Dep't of Health & Human Servs.*, 459 F.Supp.2d 1207, 1210 (N.D. Fla. 2006) (though the provider may be sold to a new owner, "the actual *provider* itself remains the same") (emphasis in original).

9

*Creditors v. Chase Manhattan Bank (In re Charter Behavioral Health Sys., LLC),* 45 Fed. Appx. 150, 2002 WL 2004651 n.1 (3rd Cir. June 3, 2002). It gets all the rights and it gets all the obligations. Again, under the applicable law, the straightforward consequence of the assignment of a Medicare provider agreement is that the assignee "merely steps into the shoes" of the assignor. *Eagle Healthcare*, 969 F.Supp.2d at 40.[6]

14. The nature and extent of any property rights in bankruptcy are determined by the underlying substantive law. *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48, 55 (1979). With regard to a Medicare provider agreement, it is "[f]ederal [Medicare] law [that] fixes the relationships and responsibilities of Medicare with . . . providers." *Mission Hosp. Reg'l Med. Ctr.*, 19 F.3d at 1117. "These relationships and responsibilities are beyond the reach of private parties . . . to alter." *Id.* Bankruptcy law recognizes that a debtor "cannot possess any more than the debtor . . . did outside of bankruptcy."

---

[6] Regardless of whatever arrangements the assignor and assignee may make between themselves privately, the key point is this: once DHHS has given its regulatory approval to the assignment of a Medicare provider agreement, DHHS deals solely with the assignee, as a matter of law.

Now, it bears mention that Medicare law does not *require* that a purchaser of a healthcare business must take assignment of the seller's existing Medicare provider agreement if it does not want to. *See Vernon Home Health*, 21 F.3d at 696. In the alternative, the purchaser may choose simply not to do business with the Medicare program at all, because doing business with Medicare is a purely voluntary choice. *See Queen City Home Care Co. v. Sullivan*, 978 F.2d 236, 247 (6th Cir. 1992). Or, as another alternative, the new operator may choose to seek to enter into a *new* provider agreement with DHHS (although this option will entail a gap period for which no Medicare payments can ever be sought).

10

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*, -- U.S. --, 139 S.Ct. 1652, 1663 (2019).

15. The Medicare provider agreement has been long- and widely-recognized as due treatment under section 365 of the Bankruptcy Code. *See, e.g., Monsour Med. Ctr.*, 11 B.R. at 1018 (dismissing the attempt to characterize the Medicare provider agreement as something other than an executory contract as mere "interesting reading . . . that . . . in no way reflects the reality of the relationship" between DHHS and hospital); *In re Santiago*, 563 B.R. 457, 474 (Bankr. D.P.R. 2017) (citation omitted) (majority of courts "considering the Medicare-provider relationship conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an executory contract"); *In re Heffernan Mem'l Hosp.*, 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996); *St. John's Home Health*, 173 B.R. at 242 n.1; *In re Tidewater Mem'l Hosp., Inc.*, 106 B.R. 876, 880 (Bankr. E.D. Va. 1989); *In re Provident Hosp. & Training Ass'n*, Case No. 87 B 11069, 1987 WL 383355, at *2 (Bankr. N.D. Ill. Sept. 16, 1987).[7] Requiring the provider agreement to be assumed pursuant to section 365 prior to the assignment of that agreement to a third-party assignee harmonizes the Medicare

---

[7] For some examples from the several judicial districts in Tennessee, *see In re New Beginnings Care, Inc.*, Bankr. E.D. Tenn. Case No. 16-10272 (ordered entered July 2, 2016; approving assumption and assignment of debtor's Medicare provider agreement, at ☐ 2) (appended as DHHS Exhibit 1); *In re Healthsphere of America, Inc.*, Bankr. W.D. Tenn. Case No. 99-26854 (order entered Oct. 5, 2000; approving same, at ☐8) (DHHS Exhibit 2); *In re New Am. Healthcare Corp.*, Bankr. M.D. Tenn. Case No. 00-03373 (order entered June 22, 2000; approving same, at ☐12) (DHHS Exhibit 3).

statute and the Bankruptcy Code. *In re Vitalsigns Homecare, Inc.,* 396 B.R. 232, 240-41 (Bankr. D. Mass. 2008). *Id.* A provider agreement cannot be sold, but assuming and assigning the provider agreement under section 365 permits the provider agreement to be transferred in conjunction with a the sale of a hospital. Moreover, it yields an outcome consistent with the terms of the applicable law of the provider agreement.

16. What matters most are, indeed, the applicable terms of Medicare law. As one bankruptcy court put it aptly and succinctly:

> [T]o the extent Debtor assumes and assigns its Medicare provider agreements to [the purchaser of Debtor's hospital], such assumption and assignment *shall be fully consistent with and subject to applicable laws and regulations governing Medicare provider agreements.*

*In re Barnwell County Hosp., Inc.,* 491 B.R. 408, 419 (Bankr. D.S.C. 2013) (all emphasis added).

17. Accordingly, DHHS, on behalf of its agency CMS, respectfully submits that any transfer of the Hospital's existing Medicare provider agreement to a purchaser of the Hospital must comport fully with Medicare law, as stated in the foregoing authorities. Any order approving the sale of the Hospital should reflect that any assignment of the Medicare provider agreement is fully subject to the applicable law; or, in the alternative, the pending motion should be denied.

**II. Objection of the Health Resources and Services Administration ("HRSA") with regard to Debtor's proposed transfer of CARES Act Provider Relief Fund moneys**

As a matter quite separate and distinct from the foregoing, DHHS, on behalf its agency HRSA, objects to Debtor's proposed transfer of moneys that Debtor has received in 2020 from the CARES Act Provider Relief Fund created by Congress in response to the coronavirus pandemic. HRSA, the agency that is overseeing the massive distributions made from the Provider Relief Fund, objects to Debtor's proposed sale insofar as Debtor seeks to transfer 'unused' Provider Relief Fund moneys to a purchaser of the Hospital.

In accepting payment from the Provider Relief Fund, Debtor attested that it will comply with DHHS directives on uses of the payment. Debtor presently proposes to transfer to a buyer of the Hospital "the remaining proceeds (the "Unused Funds") of the CARES Act Provider Relief Funds as of the Closing if allowable by order of the Bankruptcy Court and/or agreement with the United States Department of Human Services." ECF No. 220 at ☐27; ECF No. 220-1 at p.10 (§3.5). However, DHHS published a directive several months ago that in the instance of a change of ownership, Provider Relief Fund moneys are not transferrable from one corporation to another corporation. Debtor is not free to violate this directive.

In support of this portion of its objection, DHHS states as follows:

1. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub.L. 116-136 [HR748] (signed into law Mar. 27, 2020), created (among many other measures) a fund (hereinafter "Provider Relief Fund" or "Fund") in order "to reimburse, through grants or other mechanisms, eligible health care providers for

13

health care related expenses or lost revenues that are attributable to coronavirus." *Id.* Provider Relief Fund payments are to be used "for health care related expenses or lost revenues that are attributable to coronavirus." *Id.* Proper uses of payments from the Provider Relief Fund may include "building or construction of temporary structures, leasing of properties, medical supplies and equipment including personal protective equipment and testing supplies, increased workforce and trainings, emergency operation centers, retrofitting facilities, and surge capacity." *Id.* Anyone who receives a payment "shall submit reports and maintain documentation as the Secretary of [DHHS] determines are needed to ensure compliance with conditions that are imposed . . . for such payments, and such reports and documentation shall be in such form, with such content, and in such time as the Secretary may prescribe for such purpose." *Id.*

    2.    As noted, the legislation expressly vested authority for oversight and control in the Secretary of DHHS. It is the Secretary of DHHS who "reviews applications and makes payments." *Id.* Distributions from the Fund are to be "as determined appropriate by the Secretary." *Id.* The Secretary has assigned these duties to his agency HRSA. Moreover, the legislation directs that it is the Secretary, through his Office of Inspector General, who will be required to report audit findings to Congress on the administration of the Fund. *Id.* Congress directed the Secretary of DHHS to implement the "most efficient payment systems practicable to provide emergency payment." *Id.* The details of DHHS' implementation of the duty and

authority assigned to it by Congress in this regard are discussed on the DHHS departmental website, at *www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html*.[8]

3. In the great interest of expediency, DHHS made prompt initial distributions from the Provider Relief Fund to hospitals (without their having to request it). Anyone who chose to retain the payment received was required acknowledge the applicable terms and conditions.[9] This was done by completing an attestation and submitting it through a Payment Attestation Portal created by DHHS for this purpose. Access to the Payment Attestation Portal required entry of the tax identification number ("TIN") of the entity that received the payment.[10] Moreover, DHHS stated on its website that future reporting would be required in order that DHHS could ensure full compliance.

---

[8] The Court may take judicial notice of public records and government documents available from reliable sources online. *Brothers v. U.S.*, No. 16-cv-00070, 2016 WL 8716659, at *3 (M.D. Tenn. Sept. 30, 2016) (citation omitted); *Mitchell v. Tenn. Valley Auth.*, No. 14-CV-360, 2015 WL 1962203 n.2 (E.D. Tenn. Apr. 30, 2015) (citations omitted).

[9] A statement of the Terms and Conditions may be found on the DHHS departmental website at *www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-20-b.pdf*. The statement was noted as "not an exhaustive list."

[10] The use of the corporate TIN has been key to the administration of the Provider Relief Fund. As DHHS has noted, "In order to ensure program integrity and transparency, [D]HHS made Provider Relief Fund payments to health care providers based on the latest data available for a TIN."

4. Because DHHS was implementing the Provider Relief Fund legislation on an expedient basis, DHHS could not reasonably address all possible scenarios or issues at the very outset. Accordingly, DHHS addressed specific matters, as they arose, during the early weeks of the Provider Relief Fund. Of particular relevance are the substantial Frequently Asked Questions ("FAQs") that DHHS published on the departmental website, at *www.hhs.gov/coronavirus/cares-act-provider-relief-fund]faqs/index.html*. DHHS has added to and/or modified the FAQs on a rolling basis, as additional issues have arisen.

5. The question of what happens to 'unused' Provider Relief Fund payments when there is a change in the corporate ownership of a hospital was addressed early in the process. The applicable principles have been in place by DHHS since at least June 2020. A published FAQs addressed the matter:

> **If a seller receives Provider Relief Fund money prior to the completion of a sale, can the seller transfer some or all of the Provider Relief Fund money to the buyer? (Modified 6/22/2020)** If the transaction is a purchase of the recipient entity (e.g., a purchase of its stock or membership interests), then the Provider Relief Fund recipient may continue to use the funds, regardless of its new owner. But *if the transaction is an asset purchase (whether for some or all of the Provider Relief Fund recipient's assets), then the original recipient must use the funds for its eligible expenses and lost revenues and return any unused funds to HHS. In these circumstances, the Provider Relief Fund money does not transfer to the buyer,* however, buyers in these circumstances will be eligible to apply for future Provider Relief Fund payments. If a bankrupt recipient is liquidated, it must similarly use the funds for its eligible expenses and lost revenues and return any unused funds to HHS.

(all emphasis added).

6. Data on the payments that have been made from the Provider Relief Fund appear on a DHHS website tracking departmental outlays, at *www.taggs.hhs.gov/Coronavirus/Providers*. (The data are also available through HRSA's website, at *www.hrsa.gov/coronavirus*). The lengthy list posted on this website identifies the more than 362,000 entities that have received a payment from the Provider Relief Fund and that have subscribed themselves to compliance because they "agreed to the Terms and Conditions." The website indicates that payment from the Provider Relief Fund has been made to CAH Acquisition Company 11, LLC in the amount of $3,722,384 and that the company has agreed to the Terms and Conditions.

7. The potential availability of additional Provider Relief Fund payments has continued since the initial distribution. The most recent announcement of an additional $20 billion was published in early October 2020. *See www.hhs.gov/about/news/2020/10/1/trump-administration-announces-20-billion-in-new-phase-3-provider-relief-funding.html* (DHHS press release).

8. Control over and responsibility for the Provider Relief Fund was entrusted by Congress expressly to DHHS. It is DHHS that has been directed to oversee and monitor the billions of federal dollars available through this Fund. It is DHHS that is implementing and monitoring this large-scale response to the health crisis. And it is DHHS that will be obligated to report to Congress on the administration of this Fund. DHHS has taken care to address publicly the many issues and scenarios that can arise, in order to ensure that there is no uncertainty

17

and in order to ensure uniformity in the nationwide administration of the Provider Relief Fund. In this regard, DHHS spoke clearly in June 2020 on the disposition of Fund payments in the event of a sale of assets: unused payments are not to be transferred to another corporation; they are to be returned to DHHS.

9. When Debtor accepted a Provider Relief Fund payment, Debtor committed itself to compliance with the nationwide directives of DHHS on the administration of the Provider Relief Fund. Debtor cannot accept payment, agree to comply with the conditions on the use of that payment, and then choose to ignore an applicable directive. The fact that Debtor happens to be in bankruptcy creates no greater right to dispose of a Fund payment in contravention of DHHS directives than an entity has outside of bankruptcy.

10. Accordingly, DHHS, on behalf of its agency HRSA, respectfully submits that Debtor may only dispose of an unused Provider Relief Fund payment amount in a manner consistent with the published DHHS directives for all recipients, as discussed above. Any order approving the sale of the Hospital should reflect this; or, in the alternative, the pending motion should be denied.

### III. Conclusion

Consistent with the foregoing:

DHHS, on behalf of its agency CMS, respectfully asserts that an order approving sale of the Hospital assets should indicate that any assignment of the Hospital's Medicare provider agreement shall comport fully with the applicable law

of Medicare; and

DHHS, on behalf of its agency HRSA, respectfully asserts that an order approving sale of the Hospital assets should indicate that Debtor's disposition of any unused CARES Act Provider Relief Fund payment amount shall conform to DHHS' published directives for the same;

or,

In the alternative, the proposed sale of assets should be denied.

    Respectfully submitted,

    D. Michael Dunavant
    United States Attorney

    /s/ Monica M. Simmons-Jones
    Monica M. Simmons-Jones (BPR #018892)
    Assistant United States Attorney
    167 N. Main Street Suite 800
    Memphis, Tennessee  38103
    (901) 544-4231

    /s/ Stuart J. Canale
    Stuart J. Canale (BPR #012590)
    Assistant United States Attorney
    167 N. Main Street Suite 800
    Memphis, Tennessee 38103
    (901) 544-4231

**CERTIFICATE OF SERVICE**

  The undersigned certifies that a true and accurate copy of the foregoing has been mailed or delivered via the Court's electronic filing system to the debtor, debtor's attorney, the United States Trustee, and parties on the matrix.

               /s/ Monica M. Simmons-Jones
               Monica M. Simmons-Jones
             Date: October 23, 2020